IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

VINCENT EASTWOOD, Individually, and on
Behalf of All Others Similarly Situated                    PLAINTIFF

NO. 11-3075

SOUTHERN FARM BUREAU CASUALTY
INSURANCE COMPANY                                          DEFENDANT

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Currently before the undersigned is Plaintiff's Renewed Motion to Certify Class (Doc. 53).[1]  The Defendant has filed a Response (Docs. 55, 56), and the Plaintiff has filed a Reply thereto (Doc. 58).  For the reasons set forth below, the undersigned recommends that Plaintiff's motion be GRANTED and that the requested class be certified pursuant to Fed. R. Civ. P. 23(b)(3).

**BACKGROUND**

On May 24, 2010, Plaintiff Vincent Eastwood was involved in a car accident for which he was not at fault.  At the time of the accident, Plaintiff was covered under a motor vehicle insurance policy issued by Defendant Southern Farm Bureau Casualty Insurance Company. Defendant paid the limit of the insurance policy's $5,000 medical benefit coverage to Plaintiff and Plaintiff then made a claim for bodily injury damages against Progressive Insurance Company (Progressive), the insurance carrier for the individual at fault in Plaintiff's car accident.

_____

[1]As will be explained below, Plaintiff's original motion for class certification was denied without prejudice.  (Docs. 23, 34, 37.)

-1-

The insurance policy issued by Defendant to Plaintiff contained a subrogation provision, which provided:

> When a recipient of benefits under Coverage Medical and Hospital Benefits ... recovers in tort for injury, either by settlement, or by judgement, we will have a right of reimbursement and credit out of the tort recovery or settlement....  We shall have a lien upon said recovery to the extent of our said payments.

> We shall be entitled to a recovery only after you, or any covered person has been fully compensated for damages.

(Doc. 54-1 at pg. 12.)

> In a letter to Progressive dated August 26, 2010, Defendant advised Progressive:

> Please be advised that we have been called upon to make payment under our insured's policy for damages incurred in the above referenced accident.  Our investigation reveals that the liability in this matter rests with your insured.

> Our policy affords us the right of subrogation to the extent of any payments made.  Therefore, we will be looking to your company for reimbursement.

> As there may be additional payments made, we ask you to please contact us for the current subrogation amount.

> If a settlement has already been made with our insured, please provide a copy of the release and a copy of the endorsed draft.

> Please acknowledge receipt of this demand in writing at your earliest convenience....

(Doc. 54-2.)

Thereafter, Plaintiff, acting without an attorney, settled his claim with Progressive for $14,500.  According to Plaintiff, after he signed the settlement paperwork, the Progressive representative "handed [him] a check for $9,500, and said, ... 'This is Farm Bureau's check I am sending to them.'" (Doc. 56 Ex. G at pg. 45.)  Plaintiff did not say anything in response to the Progressive representative because he "didn't know [he] had any option" at that time.  (Id. at pg.

-2-

59.)  Progressive's records reflect that on November 15, 2010, they issued a check for $5,000 made payable to Defendant as "subrogee" for Plaintiff.  (Doc. 54-3.)

Plaintiff contends that Defendant violated Arkansas law, as set forth in <u>Riley v. State Farm Mut. Auto Ins. Co.</u>, 2011 WL 2410521 (Ark. June 16, 2011), by obtaining subrogation from Progressive without either Plaintiff's agreement or a judicial determination that Plaintiff had been made whole.   Plaintiff purports to bring this action on behalf of himself and a class of persons similarly situated, seeking the following relief:

* A declaratory judgment that Defendant's actions of receiving subrogation or reimbursement from its insureds['] recovery from a third-party tortfeasor prior to a made-whole judicial determination or agreement violates Arkansas law;

* An order demanding that Defendant pay monetary restitution, including pre-judgment and post-judgment interest[] to the Plaintiff, and all proposed class members, of 100% of the subrogated or reimbursed proceeds that Defendant has illegally taken from its insureds; and

* enter an order permanently enjoining Defendant from receiving subrogation or reimbursement from its insureds prior to reaching an informed agreement with its insureds that the insured has been made whole or receiving a judicial determination that the insured has been made whole.

In the motion for class certification, Plaintiff seeks to certify the class pursuant to Federal Rule of Civil Procedure 23(b)(3),  or, alternatively, pursuant to Federal Rule of Civil Procedure 23(b)(2). Plaintiff identifies the proposed class as residents of the State of Arkansas who, during the class period of July 8, 2006 through the date of resolution of this action:

-3-

(a) have, had, or were covered under a contract of automobile insurance with Defendant that includes or included an optional "med pay" and/or "PIP" coverage, (b) received a payment from Defendant under such coverage, (c) recovered money th[r]ough settlement or otherwise from a third-party tortfeasor, without the assistance of counsel, and (d) had a portion of such recovery taken by Defendant as subrogation or reimbursement without a judicial determination or agreement that the insured was made whole.

(Doc. 3 ¶ 22.)

## DISCUSSION

To obtain class certification, Plaintiff has the burden of showing that the requirements of Rule 23 have been met.  Luiken v. Domino's Pizza, LLC, 705 F.3d 370, 372 (8th Cir. 2013). A district court is accorded broad discretion to decide whether certification is appropriate and the inquiry may require the court to resolve disputes going to the factual setting of the case, which disputes may overlap the merits of the case.  Id.

Rule 23(a) of the Federal Rules of Civil Procedure sets out four prerequisites for class certification:

(1)     the class is so numerous that joinder of all members is impracticable;

(2)     there are questions of law or fact common to the class;

(3)     the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4)     the representative parties will fairly and adequately protect the interests of the class.

Once Rule 23(a)'s requirements are met, the class must also show that it meets the definition of at least one type of class under Rule 23(b).  Moreover, in addition to Rule 23's explicit requirements, there is an implicit requirement that class membership be ascertainable

-4-

by some objective standard.  <u>Haney v. Recall Center</u>, 282 F.R.D. 436, 439  (W.D. Ark. 2012);

4 F.R.D. 432, 444  (D. Minn. 2012); <u>Walls v. Sagamore Ins. Co.</u>, 274 F.R.D. 243, 250-51 (W.D.

Ark. 2011).

### Ascertainable Class

Plaintiff argues that members of the proposed class can be readily identified through

Defendant's records.  Plaintiff points out that in response to discovery requests, Defendant

identified approximately 1,300 policyholders[2] who met the objective criteria in the class

definition, and Plaintiff's counsel's review of these 1,300 claim files confirmed that there was

not a single made-whole judicial determination or a single written made-whole agreement.

Plaintiff maintains that this is corroborated by the deposition testimony of John Bonner,

Defendant's Assistant Claims Manager and Federal Rule of Civil Procedure 30(b)(6)

representative,  who could not identify any written made-whole agreements between Defendant

and its insureds and who testified that Defendant had no manual and/or policy concerning the

proper protocol for subrogation and/or made-whole determinations.

Defendant argues that membership in the proposed class is not ascertainable, as:

> Evidence produced in discovery and other evidence establishes that an
> indeterminate number of insureds orally agreed with [Defendant] that they were
> made whole, without such agreements having been documented in the files.
> There is also sufficient evidence from which such agreements may be implied.
> Some insureds endorsed a check that was made payable jointly to [Defendant]
> and the insured or wrote a separate check to [Defendant] in payment of the

---

[2]According to Defendant, it initially produced information concerning 1,424 potentially relevant claims, but subsequently determined that some of these claims did not meet one or more of the criteria in the class definition.  Defendant concedes that the exact number of relevant claims is not material to the issue of class certification (Doc. 56 at pg. 3 & n.2), and thus, the undersigned will assume that the potential class consists of approximately 1,300 insureds.

subrogation amount, implicitly agreeing in fact that they were made whole.

 (Doc. 56 at pg. 3.)

Defendant submits an affidavit from Carrie Sewell, who has worked as a subrogation specialist for Defendant since 2002, stating that Defendant does not have a manual or written procedures for handling med-pay subrogation and that she received her "training on the job from supervisors."  Ms. Sewell states:

> A claim file rarely documents every conversation with an insured, but in my experience there are various communications that indicate that the insured has decided that he or she is made whole.  As the insurer, we rely upon what the insureds tell us about whether they have any more expenses to submit and whether they believe their claim is complete.... If an insured gives any indication that he or she still has medical expenses to submit or that there may be future expenses related to ongoing treatment, [Defendant] works with the insureds either to reduce its subrogation claim or to waive any subrogation altogether.  In every claim that I am involved in where there is a potential claim for subrogation, there is open communication with the insured about the subrogation issue, and I never force the insured to agree to a subrogation payment.  I carefully listen to the insured, and if I receive any indication from the insured that he or she may not be made whole, I discuss that issue with the insured and do not proceed with accepting subrogation unless I understand that the insured either has no unreimbursed expenses, is not going to incur additional expenses, or has agreed that [Defendant] should receive the subrogation payment.

(Doc. 56-3.)  Ms. Sewell cites fourteen examples of "claims in which the insured was either made whole before the subrogation payment was made or there was an understanding between the insured and the company's representative that the insured was made whole, even if those words were not expressly used in the conversations."  (Id.)  These fourteen examples consist primarily of instances when an insured endorsed a check made jointly payable to the insured and Defendant, or sent Defendant a personal check for the subrogation amount.

-6-

Mr. Bonner, the Assistant Claims Manager designated as Defendant's Rule 30(b)(6) representative, testified that prior to the <u>Riley</u> decision, Defendant's subrogation procedures typically entailed an adjuster sending out a letter notifying the third-party's insurance carrier, as well as the Defendant's insured, that Defendant "may have a subrogation interest." Mr. Bonner acknowledged that letters sent out in the past, though "[n]ot all of them," to third-party insurance carriers were captioned "Subrogation Lien Notice and Demand Packet" and requested that Defendant's name be included on any settlement draft. (Doc. 56-1 at pg. 7, 15-17.) Mr. Bonner also acknowledged that Defendant's subrogation process did not include entering into a written made whole agreement with its insured, nor did it include making a made-whole determination, but contended that there could have been a verbal or implied agreement, as explained by Ms. Sewell in her affidavit. When asked whether this was speculation, Mr. Bonner acknowledged that it was but pointed to a particular claim file in which the subrogation specialist noted a conversation the specialist had engaged in with the insured regarding outstanding medical bills, and "[n]owhere in there are there any notes that the insured did not agree or would not have agreed to us recovering our medical." (<u>Id.</u> at pg. 10.) When asked whether he would agree that in "probably 98 percent of the [1300] claim files sent[,] ... [Defendant] received subrogation back from the third party directly," Mr. Bonner acknowledged, "I don't doubt that there are many that way ...[,] but I don't know the number.... A large majority." (<u>Id.</u> at pgs. 11-12.)

As stated by this Court is ruling on the parties' motions for summary judgment, <u>Riley</u> stands for the proposition that, absent a judicial determination that an insured has been made whole, "only a mutual agreement" between the insured and Defendant about the insured's made-whole status would permit the Defendant to collect a subrogation payment from an insured's

-7-

settlement proceeds.  The burden of proof is on the Defendant to make an agreement with the insured as to the made-whole issue and it does not suffice that the Defendant made its own determination that the insured was made whole.  (Doc. 38 at pgs. 6-7.)  Further, the Court rejected the Defendant's assertion of the defense of estoppel, noting that the Plaintiff had no opportunity to object before Defendant appropriated $5,000 of his settlement money.  The Court reasoned that Defendant bypassed Plaintiff and asserted its claim for subrogation directly with the third party insurer, who then issued a check made out to Defendant individually, and the check was cashed by Defendant before Plaintiff had the opportunity to object.  (Id. n. 1.)

The undersigned sees no merit to Defendant's argument that the proposed class is not ascertainable.

As to Defendant's contention that an indeterminate number of insureds orally agreed with Defendant that they were made whole without such agreements having been documented in the files, Mr. Bonner, Defendant's corporate representative, acknowledged that this was merely speculation.  See Agne v. Papa John's Intern., Inc., 286 F.R.D. 559, 567 (W.D. Wash. 2012) (in putative class action alleging defendants violated the law by sending unsolicited text messages, defendants' speculation that customers may have given their express consent to receive text message advertising was not sufficient to defeat class certification); Van Sweden Jewelers, Inv. v. 101 VT, Inc., 2012 WL 4127824, *4 (W.D. Mich. Sept. 19, 2012) (where plaintiff offered evidence that defendants engaged in standardized conduct with regard to class members, defendants' speculation of basis for exclusion for some class members could not defeat class certification) .  Mr. Bonner could not point to any particular evidence of such an oral agreement in the 1,300 claim files provided to Plaintiff's counsel.  Further, the affidavit from Ms. Sewell,

-8-

a subrogation specialist for the Defendant, stating that "there is open communication with the insured about the subrogation issue" and "there are various communications that indicate that the insured has decided that he or she is made whole" is inconsistent with Mr. Bonner's testimony.  Mr. Bonner acknowledged that letters sent out in the past to third-party carriers, as well as to the Defendant's insureds, were captioned "Subrogation  Lien Notice and Demand Packet" and requested that Defendant's name be included on any settlement check.  Mr. Bonner further acknowledged that Defendant's subrogation process did not include making a made-whole determination and that  in a "large majority" – according to Plaintiff's counsel, up to 98 percent – of the 1,300 claim files at issue, Defendant received  subrogation back directly from the third party carrier.  Thus, Defendant has not established that there is an indeterminate number of insureds in the 1,300 claim files at issue with whom it negotiated and entered into a verbal, mutual made-whole agreement.  This challenge to the ascertainability of class membership is, therefore, rejected.

The undersigned likewise sees no merit to Defendant's argument that class membership is not ascertainable because there are instances in which a made-whole agreement can be implied – specifically, in instances in which the insured endorsed a check made payable jointly to Defendant and the insured, or in which the insured wrote a separate check to Defendant in payment of the subrogation amount.  The simple fact that an insured endorsed a check or wrote a separate check does not establish that the insured entered into an implied made-whole agreement with the Defendant.  Given Defendant's practices of sending out lien notices and requesting that its name be included on settlement checks, it cannot be said that, by endorsing a joint check or writing a separate check for the subrogation amount, the insureds assented to the

-9-

subrogation or had a meeting of the minds with the Defendant on the made-whole issue.  In fact, the insureds may very well have not known, as the named Plaintiff alleges to have not known, that they "had any option."  An implied agreement cannot be inferred from such circumstances. See K.C. Properties of N.W. Ark., Inc. v. Lowell Inv. Partners, LLC, 373 Ark 14, 29 (Ark. 2008) (both express and implied contracts are founded upon mutual assent of the parties and require a meeting of the minds).  Further, again, Mr. Bonner acknowledged that Defendant's subrogation process did not include making a made-whole determination, and thus, Defendant cannot meet its burden of proof that it made an agreement with the insured as to the made-whole issue by simply relying on the fact the insured endorsed a joint check or wrote a separate check for the subrogation amount.

Based upon the foregoing analysis, the undersigned finds that Plaintiff has met his burden of establishing that the proposed class members can be readily ascertained.  There are 1,300 claims files that have been identified as potentially meeting the objective criteria of the class definition.  Plaintiff's counsel indicates that his review of the 1,300 files confirmed that there is not a single made-whole judicial determination or written made-whole agreement in these files. If there is proof in any of the 1,300 files of an unwritten made-whole agreement with the Defendant, then the insured should be excluded from the class.  An endorsed check or a separate check written by the insured for the subrogation amount will not suffice to exclude an insured from the class.  Thus, to be excluded from the class, there must be some documentation in the insured's claim file that the Defendant negotiated the made-whole issue with the insured and they entered into a mutually assented to, verbal made-whole agreement.

-10-

### Rule 23(a)(1) - Numerosity

The numerosity requirement of Rule 23(a)(1) requires the Court to consider whether the class is "so numerous that joinder of all members is impracticable." There are no particular rules governing the necessary size of the class, but the most obvious factor is the number of persons in the proposed class. See Paxton v. Union Nat. Bank, 688 F.2d 552, 559 (8th Cir. 1982). In addition to size, the Court may consider the nature of the action, the size of the individual claims, the inconvenience of trying individual suits, and any other factor relevant to the practicability of joining the putative members. See id. at 559-560.

Defendant concedes that at least 1,300 potential class members have been identified and merely argues that the "fact that the proposed class is not ascertainable disposes of the question of numerosity." (Doc. 56 at pg. 11.) The undersigned has found that class membership is ascertainable as discussed above. Further, Plaintiff alleges that Defendant violated Arkansas law on a class-wide basis by engaging in a practice of obtaining subrogation without a judicial made-whole determination or a made-whole agreement; Plaintiff seeks class-wide relief in the form of reimbursement of subrogated proceeds; the size of each insured's claim for reimbursement would likely discourage insureds from filing separate lawsuits; and it would certainly be inconvenient to try potentially 1,300 separate lawsuits or to join potentially 1,300 insureds as named plaintiffs. Accordingly, the undersigned finds that Rule 23(a)(1)'s numerosity requirement is met.

### Rule 23(a)(2) - Commonality

"Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2551 (2011). The class

-11-

AO72A
(Rev. 8/82)

members' claims "must depend upon a common contention ... [that is] of such a nature that it is capable of class wide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Id.

Plaintiff alleges that Defendant violated Arkansas law by engaging in a common class-wide practice of collecting subrogation without obtaining a judicial made-whole determination or entering into a made-whole agreement with the insured. Defendant does not appear to challenge Plaintiff's contention that the commonality requirement has been met. The undersigned would note that while Defendant denied having a manual or written procedures for handling subrogation, Mr. Bonner, Defendant's representative, acknowledged that Defendant's subrogation process did not include making a made-whole determination and he could not contest that in up to 98 percent of the 1,300 claim files at issue, Defendant received subrogation back directly from the third party carrier. The undersigned, therefore, finds that the commonality requirement has been met, as it appears that Defendant had an unofficial policy of seeking subrogation directly from third party carriers without seeking a judicial determination on the made-whole issue or negotiating a made-whole agreement with its insureds. This unofficial policy forms the basis for the class members' common claim. See Ross v. RBS Citizens, N.A., 667 F.3d 900, 909-10 (7th Cir. 2012) (bank employees satisfied commonality requirement where, although there might have been slight variations in how bank enforced its overtime policy, class of employees maintained a common claim that bank broadly enforced an unofficial policy denying employees earned-overtime compensation), pet. for cert. filed (Aug. 1, 2012).

-12-

**Rule 23(a)(3) and (4) - Typicality and Adequacy**

The adequacy and typicality requirements of Rule 23 "'serve as guideposts for determining whether maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'" In re Milk Products Antitrust Litigation, 195 F.3d 430, 436 (8th Cir. 1999) (quoting Amchem Prods., Inc. v. Windsor, 521 U.S. 591 (1997)).

Defendant argues that Plaintiff is an inadequate class representative because: (a) he lacks standing to seek declaratory and injunctive relief, as he cancelled his policy with Defendant in September 2010; and (b) his testimony and the history of this litigation indicate a lack of concern for his responsibilities as a class representative and a failure to vigorously pursue the interests of potential class members. The undersigned will address each argument in turn.

As to Plaintiff's standing to seek injunctive relief, Plaintiff seeks an order permanently enjoining Defendant from receiving subrogation in the future without first reaching a made-whole agreement with its insured or obtaining a judicial made-whole determination. Standing to seek injunctive relief requires a plaintiff to show a likelihood of a future injury. See Meuir v. Greene County Jail Employees, 487 F.3d 1115, 1119 (8th Cir. 2007). As Plaintiff has cancelled his policy with Defendant, he no longer faces a threat of continued harm from the Defendant. Accordingly, the undersigned agrees that Plaintiff does not have standing to seek the requested injunctive relief. See Clark v. Prudential Ins. Co. of America, 736 F. Supp.2d 902, 924 (D. N.J. 2010) (dismissing claim for injunctive relief for lack of standing where plaintiff had cancelled her health insurance policy). The undersigned believes that Plaintiff's claim for

-13-

injunctive relief is, therefore, subject to dismissal.  This does not, however, render Plaintiff an inadequate class representative, as Defendant already has a duty under Riley to reach a made-whole agreement or obtain a judicial determination prior to collecting subrogation.  Thus, injunctive relief requiring the Defendant to do this is unnecessary to protect the interests of the class.

As to Plaintiff's standing to seek declaratory relief, Plaintiff seeks a declaratory judgment that Defendant's receipt of subrogation prior to a made-whole judicial determination or agreement violates Arkansas law and an order demanding that the subrogated proceeds of the class members be returned to them.  To demonstrate standing to seek declaratory relief, a plaintiff must "'demonstrate that he has suffered [an] injury in fact, that the injury is fairly traceable to the actions of the defendant, and that the injury will likely be redressed by a favorable decision.'" County of Mille Lacs v. Benjamin, 361 F.3d 460, 463 (8th Cir. 2004) (quoting Bennett v. Spear, 520 U.S. 154, 162 (1997)).   Plaintiff alleges that he and the class members suffered an injury traceable to the Defendant's actions: Plaintiff and the class members had a portion of their insurance recovery illegally taken by Defendant as subrogation.  Further, the alleged injury of Plaintiff and the class members can be redressed by a declaratory judgment in their favor declaring Defendant's actions illegal and requiring the Defendant to reimburse the subrogation payments to Plaintiff and the class members.  Accordingly, the undersigned finds that Plaintiff has standing to seek declaratory relief.

As to Defendant's argument that Plaintiff's testimony and the history of this litigation indicate that he is not an adequate class representative, "[a] named plaintiff who lacks the desire to 'vigorously pursue' the interests of potential class members is not a fair and adequate

-14-

representative of the class." In re Milk Products Antitrust Litigation, 195 F.3d at 437.  In arguing that Plaintiff is not an adequate class representative, Defendant points to Plaintiff's deposition testimony, in which he denied having any kind of responsibility for the claims of other class members or for any costs of the lawsuit.  Plaintiff further testified, however, that he understands that he is representing a class of "1,300-some-odd people that feel like they were taken advantage of" and "had the same thing happen to them that [he] did," and that his responsibility to the class members is to "[s]tand up for what's right."  (Doc. 56 Ex. G at pgs. 83-85.)  The undersigned finds that Plaintiff's deposition testimony reflects that he has "a basic understanding of the class claims as well as an understanding of his . . . duties as the class representative and a willingness to fulfill those duties."  See Foster v. Apache Corp., 285 F.R.D. 632, 645 (W.D. Okla. 2012).  The undersigned would also note that Plaintiff's self-interested pursuit of his own claim for a declaratory judgment and restitution  will adequately protect the interests of the class members, who have the same type of claim and would be entitled to the same relief.  Id.

Defendant argues that Plaintiff's "extraordinarily long delay in pursuing class certification also indicates a general disregard for the claims of the putative class members and the rules designed to protect their interests."  (Doc. 56 at pg. 14.)   Plaintiff filed his original motion for class certification by the deadline agreed upon by the parties in their Federal Rule of Civil Procedure 26(f) report, which deadline the Court adopted and set out in its final scheduling order.  In his original motion, Plaintiff noted that discovery had been requested regarding the claimants from which Defendant collected subrogation, but the discovery had not been received as of the time of the filing of the motion.  (Doc. 24 at pg. 7.)  After conducted a hearing on the original motion for class certification, the undersigned entered a report and recommendation,

-15-

recommending that the motion be denied as premature, as it appeared further discovery was necessary to determine whether the members of the class were readily ascertainable and there were also dispositive motions pending that could impact the issues relating to class certification. (Doc. 34.)  The Court, upon Defendant's motion, thereafter, stayed discovery pending a ruling on the dispositive motions.  (Docs. 35.)  The Court subsequently entered an order adopting the undersigned's report and recommendation and denying the original motion for class certification without prejudice.  (Doc. 37.)  On the same date of that ruling, the Court ruled on the parties' dispositive motions and granted Plaintiff two weeks to file a renewed motion for class certification.  (Doc. 38.)   The Court subsequently granted Plaintiff's unopposed motion for an extension of time in which to file the renewed motion for class certification, acknowledging that further discovery was necessary.  (Docs. 39-41.)  Plaintiff then sought another extension, again, without objection from Defendant, explaining that there was a delay in discovery (which consisted of approximately 20,000 pages of documents) being provided, as opposing counsel had a death in his family.  (Doc. 50.)  The Court reset the deadline for filing the motion for class certification, and the renewed motion was filed by this deadline.  (Doc. 51, 53.)

The above history of the litigation does not  reflect a lack of diligence on Plaintiff's part. Delays in filing the current motion for class certification were attributable to the delayed production of discovery, the voluminous nature of discovery, and issues in the dispositive motions that needed to be first addressed.  Ultimately, both of Plaintiff's motions for class certification were filed by the deadlines set by the Court.  The undersigned, therefore, sees no merit to Defendant's argument that Plaintiff has failed to vigorously pursue this action.

-16-

Defendant also argues that Plaintiff has "shown a lack of attention to the details of the case." (Doc. 56 at pg. 13.)  Defendant points to the fact that Plaintiff acknowledged that he did not notice that the original complaint referred to him by the wrong name and incorrectly identified him as the passenger rather than the driver; that Plaintiff did not review the second amended complaint currently before the Court before it was filed; and that he did not know why the claim for breach of contract, which was included in the original complaint, was omitted from the second amended complaint.  The undersigned, likewise, sees no merit to this argument, as Plaintiff appeared for deposition; he has participated in telephonic and in-person meetings with counsel; he has a basic understanding of the nature of the action; and he has reviewed numerous documents relating to the action.  See Powers v. Government Employees Ins. Co., 192 F.R.D. 313, 318 (S.D. Fla. 1998) (it is not necessary for named class representative to be knowledgeable, intelligent or have a firm understanding of the legal or factual basis on which the case rests, especially in cases involving complex areas of the law; while named plaintiff was not well-versed in insurance law or the intricacies of her case, this did not warrant a finding that she was inadequate to represent the class, where record revealed that she played an active role in the litigation by appearing for deposition, producing documents and conferring with counsel).

Based upon the foregoing, the undersigned finds that Plaintiff has satisfied the typicality and adequacy-of-representation requirements of Rule 23.

## Rule 23(b)(3)'s Requirements

As stated above, in addition to meeting the requirements of Rule 23(a), Plaintiff must meet the requirements of one of the provisions of Rule 23(b).  Plaintiff seeks certification under

-17-

AO72A
(Rev. 8/82)

Rule 23(b)(3), or, alternatively, under 23(b)(2).  The undersigned finds certification under Rule 23(b)(3) appropriate and, therefore, finds it unnecessary to address the requirements of 23(b)(2).

Certification under Rule 23(b)(3) is appropriate if: (1) questions of law or fact common to the members of the class predominate over questions affecting only individual members; and (2) a class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Predominance under Rule 23(b)(3) parallels Rule 23(a)(2) in that both rules require that common questions exist.  However, the predominance criterion under Rule 23(b)(3) is much more demanding.  Amchem Prods., Inc., 521 U.S. at 623-24.  This rule tests whether the proposed class is "sufficiently cohesive to warrant adjudication by representation."  Id. at 623.

> When determining whether common questions predominate, a court must conduct a limited preliminary inquiry, looking behind the pleadings, but that inquiry should be limited to determining whether, if the plaintiffs' general allegations are true, common evidence could suffice to make out a prima facie case for the class.  While limited in scope, this analysis should also be rigorous.

In re Zurn Pex Plumbing Prod. Liab. Litig., 644 F.3d 604, 618 (8th Cir. 2011) (internal citations and quotation marks omitted), pet. for cert. filed, 80 USLW 3378 (Dec. 15, 2011).

Defendant argues that "the need to conduct individual merits determinations on the question whether each insured agreed that he or she was made whole, and to what extent, is a central, individual issue that predominates over common issues."[3]  (Doc. 56 at pg. 19.)  As stated

---

[3]Defendant also argues that the facts relevant to its affirmative defense of estoppel are case-specific and predominate over common issues.  As stated above, the Court, in ruling on the parties' dispositive motions, rejected the Defendant's assertion of the estoppel defense.  Defendant argues that the Court erred in its underlying finding that Plaintiff had no opportunity to object before Defendant appropriated $5,000 of his settlement money.  The undersigned sees no merit to this argument.  As pointed out by the Court, Defendant bypassed Plaintiff and asserted its subrogation claim directly with Progressive and the check was made out to Defendant individually.  Further, Plaintiff testified that the Progressive representative specifically advised him, "This is Farm Bureau's check I am sending to them,"

-18-

above, Plaintiff alleges that Defendant engaged in a common practice of collecting subrogation without seeking a judicial determination on the made-whole issue or negotiating a made-whole agreement with its insured.  The evidence seems to support that this was a common practice, as Mr. Bonner acknowledged that Defendant's subrogation process did not include making a made-whole determination and he could not contest that in up to 98% of the 1,300 claim files at issue, Defendant received subrogation back directly from the third party carrier.

It, therefore, appears that a common question of whether the Defendant systematically deprived its insureds of any consideration of their made-whole rights predominates over any isolated instances in which there may be evidence that an insured actually entered into a made-whole agreement.  As stated above, if there is proof in any of the 1,300 files of such an agreement, then the insured should, in any event, be excluded from the class.  Further, the relief Plaintiff is seeking on behalf of the class is (1) a declaratory judgment that Defendant's collection of subrogation prior to a made-whole judicial determination or agreement violates Arkansas law; and (2) reimbursement of the subrogated proceeds to the class members based on Defendant's failure to obtain a made-whole judicial determination or agreement.  The Plaintiff is not seeking an actual made-whole determination on behalf of the class and the Court has already held that it would be inappropriate to make such a determination in this action.  (Doc. 38 at pg. 8.)  See Diaz v. Blue Cross and Blue Shield of Mont., 267 P.3d 756, 766 (Mont. 2011) (finding common question presented for declaratory and injunctive relief, to which a single answer would affect all class members: could the defendant withhold payment of medical expenses or accept reimbursement of medical expenses paid by a third-party's insurer before it

---

and that he "didn't know [he] had any option" to object.  (Doc. 56 Ex. G at pg. 59.)

conducted a made-whole analysis?  Any individualized determinations regarding whether class members had been made whole would not occur in the context of the class action claim); Ferguson v. Safeco Ins. Co., 180 P.3d 1164, 1169-70 (Mont. 2008) (affirming class certification where plaintiff sought class-wide declaratory relief and order compelling return of subrogation amounts; plaintiff alleged that defendant systematically deprived class members of consideration of their made-whole rights; class claims did not seek a determination of entitlements for each class member and the payment of damages, but, rather, a declaratory ruling that would compel defendant to follow the made-whole legal standard in its subrogation program)[4]; cf. Vandenbrink v. State Farm Mut. Auto. Ins. Co., 2012 WL 3156596, *3 (M.D. Fla. Aug. 3, 2012) (denying class certification where threshold inquiry was individual in nature – whether the Plaintiffs were made whole through their settlements); Adelstein v. Unicare Life and Health Ins. Co., 2000 WL 35808378, *2 (M.D. Fla. Dec. 27, 2000) (plaintiff sought certification of a class consisting of  insureds from whom Defendant had collected subrogation in instances in which proceeds had been **insufficient to make whole** the insureds; court denied class certification, finding that "made-whole" determination would be class-member specific) (emphasis added). Further, the undersigned notes that if the relief requested is granted on a class-wide basis, Defendant may still pursue a separate judicial determination against any particular insured who Defendant believes was, in fact, made whole.

---

[4]In Chipman v. Northwest Healthcare Corp., 288 P.3d 193, 206 (Mont. 2012), the Montana Supreme Court noted that since its decisions in Ferguson and Diaz, the commonality requirement had been "significantly tightened" pursuant to the United States Supreme Court's decision in Dukes.  The undersigned believes that even under this "tightened" commonality standard, class certification would have still been granted in Ferguson and Diaz and that these cases, therefore, remain as persuasive authority for the granting of class certification in the instant case.

-20-

Finally, in determining whether the superiority requirement of Rule 23(b)(3) is satisfied, the Court must look at four factors: (1) the class members' interest in individually controlling their separate actions; (2) the extent and nature of existing litigation by class members concerning the same claims; (3) the desirability of concentrating the litigation in the particular forum; and (4) the likely difficulties in the management of a class action. Fed. R. Civ. P. 23(b)(3). The class members' interest in individually controlling their separate actions appears minimal, given the number of potential class members and the relatively small amount of their claims and also given the fact that Plaintiff appears to be an adequate class representative and has diligently pursued this action. Further, the undersigned is not aware of any existing litigation involving the same claims and, given that the class is comprised of Arkansas residents, the Western District of Arkansas appears to be a suitable forum. As to the last factor, this case does not appear to involve exceptional difficulty in managing it as a class action and judicial efficiency considerations favor certification.

## CONCLUSION

Based upon the above, the undersigned finds that the requirements of Rule 23(a) and 23(b)(3) have been met. The undersigned, therefore, recommends that Plaintiff's **Renewed Motion to Certify Class (Doc. 53)** be **GRANTED** with regard to Plaintiff's request for declaratory relief. As the undersigned believes that Plaintiff lacks standing to pursue injunctive relief, the undersigned recommends that his claim for injunctive relief be **DISMISSED**.

The undersigned further finds that Plaintiff's counsel in this case appears capable of fairly and adequately representing the interests of the class. Accordingly, the undersigned recommends

-21-

appointing Plaintiff's counsel that have entered an appearance in this case as class counsel under Fed. R. Civ. P. 23(g).

Finally, assuming an order is entered adopting this Report and Recommendation and granting class certification, the undersigned recommends that, in accordance with Rule 23(c)(2)(B) of the Federal Rules of Civil Procedure, Plaintiff's counsel should have 10 days from the date of that order in which to submit a proposed method and form for notifying the class members of this action.

**The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 19th day of March, 2013.


/s/ Erin L. Setser
HONORABLE ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)