IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

VINCENT EASTWOOD, individually
and on behalf of all others similarly situated                                    PLAINTIFF

v.                                    Case No. 3:11-CV-03075

SOUTHERN FARM BUREAU CASUALTY
INSURANCE COMPANY                                                           DEFENDANT

## MEMORANDUM OPINION AND ORDER

Currently before the Court is the Report and Recommendations ("R&R") (Doc. 60) filed on March 19, 2013 by the Honorable Erin L. Setser, United States Magistrate Judge for the Western District of Arkansas.  Also before the Court are Defendant Southern Farm Bureau Casualty Insurance Company's ("SFB") Objections (Doc. 61), Plaintiff Vincent Eastwood 's Response to Defendant's Objections (Doc. 67), and Defendant's Reply (Doc. 69).  For the reasons stated herein, the Court adopts the recommendations contained in the R&R and finds that Plaintiff's Renewed Motion to Certify Class (Doc. 53) should be granted.

SFB objects to the Magistrate's conclusion that Plaintiff carried his burden of showing that the proposed class is ascertainable and that Federal Rule of Civil Procedure 23(b)(3)'s predominance requirement has been satisfied.  Plaintiff endorses the Magistrate's recommendations and opposes SFB's objections to the R&R.

When faced with a party's objections to the proposed findings and recommendations of a magistrate judge, the district court must conduct a de novo review of all specified proposed findings and recommendations to which the party has raised objections.  28 U.S.C. § 636(b)(1).  Having conducted this review, the Court now finds that the objections filed by Defendant offer neither law

-1-

nor fact requiring departure from the R&R.

## I.      Factual and Procedural Background

Plaintiff, on behalf of himself and all others similarly situated, filed a complaint in the Circuit Court of Carroll County, Arkansas, against his auto insurance company, SFB, on June 20, 2011. Plaintiff had been involved in a car accident in which he was not at fault.  After the accident, SFB paid Plaintiff the policy limits of $5,000 in personal injury protection ("PIP") to cover his medical costs.  Plaintiff's insurance contract provided that subrogation of the PIP payment would be owed to SFB if Plaintiff were made whole for his losses as a result of settling with the tortfeasor or another third party.

Thereafter, Plaintiff, proceeding pro se, negotiated with the tortfeasor's insurance carrier, Progressive Insurance Company ("Progressive"), and obtained a settlement in the amount of $14,500.  Upon learning of Plaintiff's settlement, SFB contacted Progressive directly and requested that Progressive reimburse SFB for $5,000, the full amount of SFB's PIP payment to Plaintiff.  Later on, when Plaintiff met with Progressive to receive his settlement check, the Progressive representative handed Plaintiff a check for $9,500, rather than the full $14,500.  The Progressive representative showed Plaintiff a second check, made out to SFB individually for $5,000, and explained, "This is Farm Bureau's check I am sending to them."  Plaintiff claims he said nothing to Progressive's representative about the reduction of his settlement or the payment of subrogation to SFB because Plaintiff "didn't know [he] had any option."  (Doc. 60, pp. 18-19 n. 3).  Plaintiff further claims that he disputed that subrogation was owed to SFB since Plaintiff believed he had not been made whole through his settlement with Progressive.

The made-whole doctrine  in Arkansas law provides that an insured should not be unjustly

enriched at the expense of an insurer.  *Southern Farm Bureau Cas. Ins. Co. v. Tallant*, 362 Ark. 17, 24 (2005).   An insurer is entitled in equity to be reimbursed for payments made on behalf of its insured, provided that the insured first has been "wholly compensated for his injuries."  *Shelter Mut. Ins. Co. v. Kennedy*, 347 Ark. 184, 189 (2001).  The made-whole doctrine is designed to prevent an insured from obtaining a double recovery on his loss, but it cannot be enforced prematurely by an insurance company before the insured has received full compensation.  *Shelter Mut. Ins. Co. v. Bough*, 310 Ark. 21, 28 (1992) ("Thus, while the general rule is that an insurer is not entitled to subrogation unless the insured has been made whole for his loss, the insurer should not be precluded from employing its right of subrogation when the insured has been fully compensated and is in a position where the insured will recover twice for some of his or her damages.").

Prior to the Arkansas Supreme Court's decision in *Riley v. State Farm Mutual Automobile Insurance Co.*, 2011 Ark. 256 (2011), it was unclear exactly when an insurance company's subrogation lien might arise.  The *Riley* court decisively concluded, however, that "[t]he consensus in Arkansas case law is that a legal determination, absent agreement of the parties, of whether the insured has been made whole can occur after a settlement is reached but must occur before the insurance company is entitled to recover in subrogation."  *Id.* at *12.  The *Riley* court further held that "when the parties are in disagreement, a determination made by the insurance company that the insured has been made whole does not suffice."  *Id.*  Instead, an insurance company seeking subrogation is required to secure either a legal determination by a court that the insured was made whole or an agreement with the insured that he was made whole *prior to* collecting subrogation.

When Plaintiff filed his lawsuit against SFB, he requested damages on behalf of himself and all others similarly situated for subrogation payments allegedly paid to SFB in violation of Arkansas

-3-

law, as announced in *Riley*.  Plaintiff amended his class action complaint on July 28, 2011, asserting

a single claim for declaratory judgment and dropping his earlier claims for breach of contract and

conversion.  Then SFB removed the case to this Court on September 6, 2011, due to the presence

of federal diversity jurisdiction and pursuant to the Class Action Fairness Act, 28 U.S.C. §§ 1332(d)

and 1453(b).

On November 28, 2011, SFB filed an amended answer and counterclaim for declaratory

judgment, asserting that Plaintiff had been made whole through his settlement with Progressive and

therefore had no right to recover SFB's subrogation payment.  Plaintiff responded by filing a motion

for summary judgment with respect to SFB's counterclaim, which the Court granted on July 19, 2012

(Doc. 38).[1]  In dismissing SFB's counterclaim, the Court concluded that SFB had not secured a legal

determination that Plaintiff had been made whole or entered into a made-whole agreement with

Plaintiff prior to obtaining a subrogation payment from the proceeds of Plaintiff's settlement with

Progressive.  The Court refused to evaluate whether Plaintiff's settlement with Progressive had

actually made him whole for losses incurred as a result of his auto accident and found that the made-

whole determination should have been made by a court prior to the payment of subrogation, pursuant

to Arkansas law.

Plaintiff filed his first motion for class certification on December 15, 2011.  This motion was

referred to Magistrate Judge Setser, who ultimately recommended in an April 24, 2012 R&R to the

---

[1] In the same order, the Court also denied a separate motion (Doc. 20) filed by Plaintiff for
partial summary judgment of his affirmative claims for breach of contract and conversion.  However,
Plaintiff's amended complaint no longer pleaded causes of action for breach of contract and
conversion, and instead asserted a single claim for declaratory judgment.  The Court declined to
consider granting Plaintiff summary judgment on causes of action that had been dropped from the
amended complaint.

Court that further discovery was required to determine whether the members of Plaintiff's proposed class were readily ascertainable. The Magistrate also opined that there were outstanding fact issues that needed to be resolved through discovery, including whether the class was sufficiently numerous to warrant certification. Because the Court agreed with the Magistrate that it was premature to rule on class certification at that time, her recommendation to deny Plaintiff's first motion for class certification was affirmed on July 19, 2012, with the proviso that Plaintiff would be free to renew the motion at a later date after the completion of discovery as to class certification issues.

On January 10, 2013, Plaintiff filed a renewed motion to certify class, which the Court again referred to Magistrate Judge Setser. Defendant filed a response in opposition to the motion on January 24, 2013, and Plaintiff filed a reply on January 31, 2013. The Magistrate issued an R&R on March 19, 2013, recommending that a class be certified. Thereafter, on April 1, 2013, SFB submitted timely objections to the R&R. Plaintiff filed a response to SFB's objections on April 15, 2013. SFB sought and was granted leave to file a reply, which was filed on April 22, 2013. The Court then scheduled an evidentiary hearing for the purpose of receiving argument and evidence, including the testimony of witnesses, as to SFB's objections to the R&R. The evidentiary hearing took place on May 6, 2013. During the hearing, SFB introduced a number of exhibits and called a witness, SFB employee and subrogation specialist Carrie Sewell, to testify. Plaintiff entered several exhibits into evidence and also called its own witness to testify, Jeffrey George Reidesel, a former insured of SFB.

## II.    Legal Standard

Pursuant to Federal Rule of Civil Procedure 23, certifying a class action requires a two-step analysis. First, a class action may be maintained if (1) the class is so numerous that joinder of all

members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.  Fed. R. Civ. P. 23(a)(1-4).  Second, a class action will be deemed appropriate if the court finds that questions of law or fact common to class members predominate over questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  Fed. R. Civ. P. 23(b)(3).

A recognized prerequisite to the class certification inquiry involves the court's assessment of the ascertainability of the class.  The requirement of ascertainability simply means that the description of a proposed class must be sufficiently definite "so that it is administratively feasible for the court to determine whether a particular individual is a member."  7A Charles Alan Wright *et al.*, *Federal Practice and Procedure* § 1760 (3d ed. 2005).  "The requirement that a class be clearly defined is designed primarily to help the trial court manage the class.  It is not designed to be a particularly stringent test, but plaintiffs must at least be able to establish that the general outlines of the membership of the class are determinable at the outset of the litigation."  *Bynum v. District of Columbia*, 214 F.R.D. 27, 31 (D.D.C. 2003).

The district court retains "broad discretion in determining whether to certify a class, recognizing the essentially factual basis of the certification inquiry and . . . the district court's inherent power to manage and control pending litigation."  *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 616 (8th Cir. 2011) (internal quotations and citations omitted).  In considering SFB's objections to the Magistrate's R&R, the Court has analyzed the following class definition proposed by Plaintiff:

-6-

Residents of the State of Arkansas who, during the Class Period of July 8, 2006 through the date of resolution of this action,

(a) have, had, or were covered under a contract of automobile insurance with Defendant that includes or included an optional "med pay" and/or "PIP" coverage, (b) received a payment from Defendant under such coverage, (c) recovered money through settlement or otherwise from a third-party tortfeasor, without the assistance of counsel, and (d) had a portion of such recovery taken by Defendant as subrogation or reimbursement without a judicial determination or agreement that the insured was made whole.

## III.   Discussion

SFB makes a number of objections to the R&R now before the Court.  First, SFB argues that the class cannot be properly ascertained due to the possibility that an indefinite number of potential class members entered into oral or implied made-whole agreements with SFB and thus fail to meet sub-part (d) of the class definition.  Second, and closely related to the first objection, SFB contends that because an undetermined number of class members made oral or implied made-whole agreements with SFB, certifying the class would require the Court to engage in an individualized, merits-based inquiry to determine whether each proposed class member should be included or excluded from the class.  Because this individualized inquiry would be required according to SFB, this would also mean that questions of law or fact affecting individual class members would predominate over questions of law or fact common to the class, thus weighing against certification of the class.

Third, SFB objects that the Magistrate "cross[ed] the line between proper consideration of the merits of a case and improper resolution of a case on the merits at the class certification stage" by evaluating and, in SFB's view, disregarding SFB's proof of the alleged existence of oral or implied made-whole agreements entered into by members of the proposed class.  (Doc. 61, p. 17).

-7-

SFB believes that the R&R contains a finding that only written made-whole agreements are legally enforceable and that written documentation in the claims files is the only acceptable proof of made-whole agreements.  SFB also believes that the Magistrate improperly discounted the testimony of two SFB employees, John Bonner and Carrie Sewell, in finding that the existence of oral or implied made-whole agreements was nothing more than speculation.

Finally, SFB makes both an objection to the R&R and a request for reconsideration of an earlier order of this Court in arguing that the affirmative defense of estoppel should apply or potentially apply to Plaintiff's individual claims as well as to the claims of the proposed class.[2] SFB's position is that if the estoppel defense were held to apply or potentially apply to class members' claims, the Court would be required to conduct an individualized, merits-based inquiry into the factual circumstances surrounding each class member's claims in order to determine whether estoppel should bar recovery.  The need for such an individualized inquiry, according to SFB, would defeat the predominance requirement of Rule 23(b)(3) and militate against class certification.

Before turning to SFB's objections to the R&R, the Court observes that many of the Magistrate's findings were not objected to, including her finding that Rule 23(a)'s requirements for the maintenance of a class action were satisfied.  The Court has reviewed the R&R's findings as to Rule 23(a)'s requirements and affirms both the Magistrate's reasoning and her conclusions. Accordingly, the Court finds that the proposed class is so numerous that joinder of all members is impracticable, there are questions of law or fact common to the class, the claims or defenses of Plaintiff are typical of the claims or defenses of the class, and Plaintiff as class representative will

---

[2] In an earlier order (Doc. 38), the Court held that the estoppel defense was inapplicable to Plaintiff's individual claims.

fairly and adequately protect the interests of the class.

### A.    Ascertainability and Predominance

The first two objections to the R&R concern the ascertainability of the class and the predominance of class issues over individual issues in light of SFB's allegation that oral or implied made-whole agreements may exist as to an undetermined number of the proposed class members. SFB has conceded that "[a]fter an intensive file-by-file review by a team of persons, SFB identified approximately 1,300 claim files that satisfy parts (a) through (c) of the class definition and also the payment-recovery portion of part (d)." (Doc. 56, p. 3).  However, according to SFB, the 1,300 insureds whose claims files were identified in the review process may not all meet the class definition.  To ascertain the true composition of the class, SFB argues that "a merits determination" is necessary in order to verify "whether each insured orally or impliedly agreed that he or she was made whole before SFB received money in subrogation."  (Doc. 61, p. 3).

SFB admits that no written, express made-whole agreements were made with any of its insureds, including the 1,300 insureds identified as otherwise meeting the class definition.  SFB also admits that it obtained no judicial determinations as to the made-whole status of any of its insureds prior to asserting claims for subrogation.  Further, it appears that after months of discovery on class certification issues, SFB's only proof of the existence of so-called oral or implied made-whole agreements is limited to:  (1) notes made by SFB claims representatives, (2) a handful of cancelled checks issued for the payment of subrogation to SFB, and (3) the recollections of SFB's employees as to their understanding of whether SFB's insureds agreed they had been made whole prior to paying subrogation.

Rather than identify which of the 1,300 insureds in the proposed class allegedly entered into

these oral or implied made-whole agreements, SFB suggests that any number of potential class members may have entered into such agreements. The vagueness of SFB's claims and lack of decisive evidence form the very basis of SFB's argument that the class cannot be properly ascertained without resorting to individualized proof. Plaintiff is helpless to defend against this argument, as only SFB is in the position to submit proof of these hypothetical agreements, and SFB believes the only way to uncover such proof is to evaluate all 1,300 claims files, one by one.

In addition, SFB goes so far as to suggest that *any* "evidence of agreement"—no matter how compelling—could require the Court to engage in a merits-based, case-by-case analysis of each potential class member's claims file. SFB believes it "has no burden to convince the Court that such agreements actually exist in specific files or that they exist in given numbers." (Doc. 69, p. 2).

### 1. Propriety of the R&R's inquiry into the merits of SFB's opposition to class certification

The mere possibility that certain class members may have entered into oral or implied made-whole agreements does not, in and of itself, foreclose the Court's ability to generally define a class, particularly at this early stage in the litigation. As is explained in further detail below, the Court affirms the Magistrate's conclusion that there has not been sufficient evidence presented by SFB to show that any made-whole agreements actually exist. Furthermore, the Court finds it highly improbable that SFB will discover other, better proof in the future to establish the existence of these made-whole agreements. The Court disagrees with SFB that the R&R made a finding that made-whole agreements or evidence of made-whole agreements must be exclusively in writing. The Magistrate made no such assumption or conclusion. Instead, the Magistrate examined and tested SFB's proof—both written and oral—of the existence of either oral or implied made-whole

agreements with potential class members.  The Magistrate ultimately found that the proof presented by SFB did not constitute evidence of made-whole agreements and was merely speculative in nature. The Court observes that if the Magistrate had *not* examined this proof and had summarily refused to certify the class simply because SFB was opposed to certification, this failure to test SFB's proof would have been error.

At the class certification stage, a court is tasked with engaging in a preliminary inquiry "to determine the nature of the evidence that would be sufficient, if the plaintiff's general allegations were true, to make out a prima facie case for the class." *Blades v. Monsanto Co.*, 400 F.3d 562, 567 (8th Cir. 2005).  Performing this preliminary inquiry for class certification purposes "may require the court to resolve disputes going to the factual setting of the case, and such disputes may overlap the merits of the case." *Id.*  The Supreme Court reiterated this point in the case of *Wal-Mart Stores, Inc. v. Dukes*, in which it made clear that "sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question, and that certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." 131 S.Ct. 2541, 2551 (2011) (internal quotations and citations omitted).  In performing this "rigorous analysis" prior to determining whether a class should be certified, a court may be obligated to inquire about some issues that overlap with the merits of the plaintiff's underlying claims.  Such overlap, according to the Supreme Court in *Dukes*, "cannot be helped." *Id.*  Accordingly, the Court finds that the Magistrate did not exceed the scope of her charge in conducting a preliminary inquiry, for class certification purposes, as to the existence of proof of oral or implied made-whole agreements.

### 2.    SFB's evidence of oral or implied made-whole agreements

SFB maintains that it entered into oral or implied made-whole agreements with insureds, including members of the proposed class, and that evidence pointing to the existence of these agreements must defeat class certification.  The Court observes that the burden of proof that made-whole agreements exist lies solely with SFB, not Plaintiff.  *Riley*, 2011 Ark. at \*12.  The Court cannot assume that agreements were made simply because subrogation payments were collected by SFB after insureds entered into settlements with third parties.  *See id.* (insurance company cannot unilaterally determine that an insured has been made whole; burden of proof rests on insurer to show evidence of made-whole agreement when "parties are in disagreement"); *see also Lopez v. United Auto. Ins. Co.*, 2013 Ark. App. 246, \*7 (Ark. Ct. App. 2013) ("It was not until *Riley* that the supreme court clarified that the burden of proof regarding whether the insured had been made whole was on the insurer.").  Moreover, Plaintiff is not obligated to sift through SFB's claims files prior to class certification to "prove a negative"—in other words, to demonstrate to the Court that all 1,300 class members *did not* make oral or implied made-whole agreements with SFB.

SFB's proof of the existence of made-whole agreements with proposed class members was presented at the May 6, 2013 hearing conducted by the Court and, prior to the hearing, in briefing submitted to the Court.  During the hearing, SFB introduced several pages of notes written by SFB's claims representatives and subrogation specialists pertaining to 67 separate insureds' claims files. (Def.'s Hr'g Ex. 1-67).  These notes reference settlements between third-party carriers and insureds and also document SFB's attempts to obtain subrogation payments from both third-party carriers and insureds.  In some cases, the notes refer to subrogation payments received by SFB in the form of personal checks from insureds or checks sent by third-party insurance companies to "SFB as subrogee" of a particular insured.  SFB provided the Court with examples of both of these types of

-12-

checks—personal checks from insureds, which SFB admits are the exception to the rule, and checks from third-party carriers listing SFB "as subrogee."  After reviewing all of this evidence, the Court finds that the file notes and checks do not constitute proof of the existence of made-whole agreements between SFB and its insureds.  The notes and checks are simply evidence that subrogation payments were demanded by and paid to SFB.  More evidence than this is required to establish the existence of made-whole agreements, even assuming that a made-whole agreement may be oral or implied.

The *Riley* decision stands in part for the proposition that "an insurance company and its insured are permitted to reach an agreement that the insured has been made whole without the necessity of a judicial determination," 2011 Ark. at *16; however, such "agreement" cannot be evidenced by an insured's payment of subrogation funds to its insurer, without more.  Even an implied-in-fact contract must demonstrate the intention of the parties through their acts or other circumstances.  *Pettus v. McDonald*, 343 Ark. 507, 513 (2001).  An insured's payment of a subrogation demand does not necessarily mean that payment was made due to the insured's belief or understanding that he had been made whole prior to payment.   "Both express and implied contracts are founded upon mutual assent of the parties and require a meeting of the minds."  *K.C. Props. of N.W. Ark., Inc. v. Lowell Inv. Partners, LLC*, 373 Ark. 14, 29 (2008).  Therefore, when an insured pays an amount demanded by SFB, it cannot be presumed that SFB and the insured had a meeting of the minds and mutually agreed that subrogation was owed *because the insured had been made whole*.  Nor can agreement be proven simply because an insured kept silent or failed to object to a subrogation payment, particularly when subrogation was demanded directly from third-party carriers, as SFB admits occurred in a large majority of the proposed class members' cases.

-13-

At the May 6 hearing, Plaintiff submitted multiple examples of subrogation demand letters that SFB sent to third-party insurance carriers.  After examining these demand letters, it appears that those sent pre-*Riley* are each titled "Subrogation Lien Notice & Demand."  *See, e.g.*, Pl.'s Hr'g Ex. 1, letter to State Farm dated July 27, 2010.  The letters often list specific subrogation amounts "owed" by each insured and specifically request that SFB's name be included on all settlement drafts.  *Id.*  They also state: "If a settlement has already been made with our insured, please provide a copy of the release and also a copy of the endorsed draft."  *Id.*

Post-*Riley* demand letters are the same in tenor and content as pre-*Riley* letters, except these demands are no longer improperly characterized as "liens."[3]  Further, SFB's post-*Riley* demand letters now instruct third-party insurers to "contact [SFB] regarding our potential subrogation claim *before reaching a settlement* so that our subrogation right is protected and your company is not exposed to additional liability under existing Arkansas law."  *See, e.g.*, Pl.'s Hr'g Exhibit 1, letter to State Farm dated September 29, 2011 (emphasis added).  These post-*Riley* letters also include SFB's mailing address and advise third-party carriers to mail all subrogation payments, in the amounts provided, directly to SFB.  *Id.*

It appears to the Court from reviewing these subrogation demand letters that SFB had a routine practice of: (1) specifying to third parties the exact subrogation amounts "owed" by insureds; (2) soliciting these amounts from third parties without knowing whether settlements had been finalized; and (3) soliciting these amounts without knowing how much insureds had been offered or had received in their settlements.  These demand letters therefore show it is unlikely that SFB

---

[3] The Arkansas Supreme Court made clear in the *Riley* case that an insurance company's letter and demand for subrogation payment did not constitute an actual lien. *Riley*, 2011 Ark. at *14.

routinely entered into made-whole agreements with insureds prior to making subrogation demands of third parties, as such agreements could not have been valid unless the insureds believed they had been made whole for their losses through settlement.  Here, it appears that SFB made subrogation demands for specific amounts "owed" without knowledge of or regard for the total settlement amounts received by insureds, or, potentially, before settlements had even been reached.

In addition to the file notes and checks, SFB also offered the deposition and affidavit testimony of John Bonner and Carrie Sewell, two of SFB's employees with knowledge of the subrogation policies of the company,  to support SFB's argument that oral or implied made-whole agreements actually exist in the claims files of the proposed class members.  As explained above, the Magistrate was within her discretion to examine this evidence to determine whether it presented sufficient justification to refuse to certify the class on the grounds argued by SFB.  Mr. Bonner, SFB's Assistant Claims Manager and designated Rule 30(b)(6) representative, provided deposition testimony that both the Magistrate and the Court reviewed.  In the R&R, the Magistrate concluded, as does this Court, that Mr. Bonner's testimony offered nothing more than mere speculation that oral or implied made-whole agreements were made between SFB and its insureds.  Mr. Bonner pointed to no proof of agreement other than the fact that subrogation payments were made and that claims files were devoid of notes indicating that any of the proposed class members objected to the payments.

As for Ms. Sewell's testimony, SFB maintains in its objections that the Magistrate gave no weight to Ms. Sewell's affidavit, "even though her testimony provides support for the existence of oral and implied agreements." (Doc. 61, p. 10).  Indeed, SFB quotes from Ms. Sewell's affidavit at length in its objections to the R&R and even goes so far as to claim in its reply brief that Ms.

-15-

Sewell's testimony alone is sufficient for a fact-finder to conclude that oral or implied made-whole agreements actually exist among the claims files of the potential class members.  (Doc. 69, p. 2). Because Ms. Sewell's testimony is regarded by SFB as important to its claim that oral or implied agreements exist, the Court was pleased to hear directly from Ms. Sewell when she testified at the May 6 hearing regarding SFB's practice of collecting subrogation payments and her own perception of whether insureds had entered into made-whole agreements with SFB.

Ms. Sewell testified as follows regarding how she was trained as a subrogation specialist to recognize an insured's made-whole agreement:

> Q.  [W]hen Southern Farm Bureau receives a reimbursement check from a third party, from Southern Farm Bureau's perspective, the insured consented to the payment and has agreed they have been made whole.  Is that how you were trained?
> **A.  Yes.**
> Q.  Okay.  So anytime that you receive a payment from a third party, whether you've had any discussion with anybody or not, you've been trained that the person's made whole if they don't tell you otherwise?
> **A.  Correct.**
> Q.  Okay. So how could there be a meeting of the minds if you've never had a conversation with the other party, with your insured?
> **A.  I'm not sure.**

(Doc. 74, p. 74).

Ms. Sewell also testified that in her opinion, any time an insured sent funds to SFB, this meant a made-whole agreement had been made:

> Q.  You testified earlier that you deduced that there was a made whole agreement?
> **A.  Yes.**
> Q.  Correct?  Can you tell me how, in looking at a piece of paper that contains nothing more than a check on it, you can deduce that there was a meeting of the minds?
> **A.  With the insured signing over the funds to Farm Bureau, I think that's an agreement.**
> Q.  Agreement to what?
> **A.  An agreement that they are wanting to reimburse Farm Bureau back.**

-16-

> Q.  Is it – I understand that they're paying Farm Bureau back, what – how do you deduce from this that they had received a double recovery from Farm Bureau or from the third party and wanting to pay you back?
>
> **A.  In my opinion, I think that they were dis – if they did not agree that they were being made whole, that they wouldn't have signed the check over.**
>
> Q.  Okay.  But you agree with me that Southern Farm Bureau, as a business practice, does not engage in conversations with its insureds about the made whole doctrine and double recovery and things of that nature, correct?
>
> **A.  Right.**

*Id.* at pp. 79-80.

> Q.  So anytime that you receive money back from a – one of your insureds, you make the assumption that they are made whole?
>
> **A.  Yes.**
>
> Q.  And you, as one of two subrogation specialists for Farm Bureau, that is your policy?
>
> **A.  Yes.**

*Id.* at p. 86.

Finally, Ms. Sewell testified that SFB employees do not engage in discussions with insureds about whether the insureds feel they have received "too much money" or "a double recovery" as a result of settlement with a third party.  *Id.* at pp. 77 & 88.  Further, she testified that SFB calculates how much an insured owes in subrogation as follows:

> Q.  Okay.  And when [the insureds] call and say how much do we owe Farm Bureau back, do you say, well, I guess that depends?
>
> **A.  When they ask that question, I will pull up the medical logs and say this is the – this is the amount we've paid out.**
>
> Q.  And you just give them the amount that the computer file shows as owed?
>
> **A.  Correct.**
>
> Q.  Do you ask them have you received a double recovery from your settlement?
>
> **A.  No.  I don't ask that question.**
>
> Q.  Okay.  Do you ask them, or do you inform them, do you know you don't have to pay us this back as our insured unless you feel you are made whole?
>
> **A.  Not in those specific terms, I don't; no.**
>
> Q.  Do you tell anyone you don't have to pay us back until unless – and that if you disagree with paying us back, we are required to get a court order?
>
> **A.  No, no.**

-17-

Q. Ever?

**A. No.**

*Id.* at pp. 78-79.

Considering Ms. Sewell's testimony at the May 6 hearing, it is evident that the Magistrate correctly concluded that the existence of legally enforceable made-whole agreements between SFB and members of the prospective class is speculative at best. Indeed, if Ms. Sewell's testimony constitutes the strongest evidence SFB possesses as to the existence of such agreements, then it is probable that no such agreements were made.[4] Class certification should not be denied due to a mere possibility that, in the future, evidence may show that some class members do not meet the class definition and must be excluded. *Van Sweden Jewelers, Inc. v. 101 VT, Inc.*, 2012 WL 4127824, at *4 (W.D. Mich. Sept. 19, 2012) (where plaintiff offered evidence that defendants engaged in standardized conduct with regard to class members, defendants' speculation that some class members should be excluded due to their consent to defendants' actions was insufficient to defeat class certification); *Agne v. Papa John's Int'l, Inc.*, 286 F.R.D. 559, 567 (W.D. Wash. 2012) (defendant's speculation that potential class members may have entered into oral consent agreements with defendant, absent persuasive evidence of such agreements, was insufficient to defeat class certification); *Mazzei v. The Money Store*, 288 F.R.D. 45, 68 (S.D.N.Y. 2012) (even though defendants "raise[d] the specter" that some if not all class members could be barred from recovery due to their knowing and voluntary payment of allegedly improper fees, this "pure speculation" alone

---

[4] Despite the fact that no made-whole agreements are likely to exist, the proposed class of insureds is likely to include some number of individuals who were actually made whole through their settlements with third parties. This Court, however, will not engage in judicial made-whole determinations in the instant litigation.

-18-

was insufficient to defeat class certification).

### 3.      Issues of law and fact common to the class

The Magistrate identified the following mixed question of law and fact applicable to the class: did SFB systematically deprive its insureds of any consideration of their made-whole rights?

In addition, the Court has identified the following facts that are common to the class. First, none of the 1,300 potential class members identified by SFB entered into written made-whole agreements. Second, no judicial determinations were made regarding the made-whole status of any potential class members. Third, SFB's claims files did not contain notes referencing "made whole agreements" with any potential class members. Fourth, SFB lacked manuals, protocols, policies, or other written procedures that defined what a made-whole agreement was or explained what constituted a made-whole agreement. Fifth, SFB provided no training to its subrogation specialists regarding how to identify whether insureds had been made whole or whether insureds agreed they had been made whole. Sixth, SFB's employees were not trained to discuss with insureds whether the insureds believed they had been made whole or agreed they had been made whole prior to the payment of subrogation. Seventh, SFB did not have a practice of requiring its employees to ask insureds whether the insureds believed they had received double recoveries in their settlements with third-party insurers. Eighth, SFB collected subrogation payments from at least a large majority of potential class members by directly soliciting such payments from third-party insurers. Lastly, ninth, SFB had a practice of sending third-party insurers subrogation lien notices and requesting that SFB's name be placed on settlement checks made out to insureds.

Considering the above issues of law and fact, as well as the common issues that are encompassed by the class definition proposed by Plaintiff, the Court finds that common issues

predominate over individual issues, and, on balance, the proposed class meets Rule 23(b)(3)'s predominance requirement.

**B.     SFB's Affirmative Defense of Estoppel**

SFB's final objection pertains to both the Magistrate's findings in the R&R and this Court's prior order on summary judgment with respect to SFB's estoppel defense.  SFB contends that it should be allowed to raise the affirmative defense of estoppel in the course of this litigation, potentially to bar any and all class members' claims, if applicable.  SFB also maintains that each class member's individual claims and the facts surrounding them will have to be examined in order to determine whether the affirmative defense applies.  Such an individualized inquiry, SFB argues, shows that individual issues predominate over common issues.

The affirmative defense of estoppel was considered and stricken with respect to Plaintiff's individual claims on summary judgment.  (Doc. 38).  At the time the Court determined that estoppel was inapplicable to Plaintiff's claims, the class had not yet been certified, and no class claims were before the Court.  SFB now urges the Court to reconsider its ruling striking the estoppel defense as to Plaintiff, arguing that Plaintiff "had a duty to speak when control [of his settlement funds] was transferred to SFB before his eyes."  (Doc. 61, p. 16).

First, the Court declines SFB's invitation to reconsider its earlier ruling regarding the inapplicability of the estoppel defense to Plaintiff's individual claims.  As noted by the Court in its order on summary judgment (Doc. 38), Plaintiff had no meaningful opportunity to object to SFB's appropriation of a portion of his third-party settlement because SFB solicited its payment directly from the third-party carrier, without first obtaining a judicial determination that Plaintiff had been made whole or Plaintiff's agreement that he had been made whole through the settlement.  From

reviewing the evidence presented in the case thus far, the Court believes that the vast majority of proposed class members, like Plaintiff, had no meaningful opportunity to object to SFB's subrogation payments.

SFB admits that its routine business practice was to send subrogation demand notices to third-party carriers when SFB became aware that its insureds had entered into settlements with third parties. A review of multiple examples of these demand letters reveals, however, that SFB had a practice of sending them *before* they had confirmation that settlements had been finalized with insureds. *See, e.g.*, Pl.'s Hr'g Ex. 1, letter addressed to State Farm dated September 29, 2011. In addition, letters sent to third-party insurers pre-*Riley*, but still within the proposed class period, explicitly requested that SFB's name be included on any settlement draft. *See, e.g.*, Pl.'s Hr'g Ex. 1, letter to State Farm dated July 27, 2010. To the Court, these demand letters collectively indicate that SFB intended for third-party carriers to pay subrogation demands directly to SFB, bypassing the insureds.

It is therefore likely that, as to the majority of potential class members, regardless of the dates of their claims, the estoppel defense will not be available to SFB because subrogation payments were solicited and received directly from third party insurers, constructively depriving class members of the opportunity to object. Indeed, it is meaningless for an insured to "object" once a check for subrogation payment is written to SFB and the insured's settlement is reduced by the amount of SFB's payment. SFB received subrogation payments directly from third-party carriers in at least a large majority of class members' cases.[5] Therefore, the Court is convinced that a large majority of

---

[5] When Mr. Bonner was asked under oath whether he agreed that in "probably 98 percent of the [1,300] claim files . . . Southern Farm Bureau received subrogation back from the third party directly," he responded as follows: "I don't doubt that there are many that way. Yes, we received

the 1,300 potential class members—perhaps on the order of 98% of the class, as has been suggested by Plaintiff's counsel—are similarly situated to Plaintiff and had no opportunity to meaningfully object before payments were made.

The Court leaves open the possibility, however, that in a small number of individual class members' cases, the estoppel defense could apply. For instance, if an insured paid subrogation directly to SFB with the insured's personal check, an argument could be made that the insured had the opportunity or duty to object prior to making the payment. Even in such a case, however, the estoppel defense would be susceptible to proof and argument, and the Court would be tasked with determining whether the defense would apply to diminish or eliminate the class member's claims.[6]

Despite the possibility that the estoppel defense may be applicable to a limited number of class members' claims, the proposed class still satisfies the predominance requirement. "After all, Rule 23(b)(3) requires merely that common issues predominate, not that all issues be common to the

---

several; but I don't know the number." (Doc. 56-1, p. 11). Mr. Bonner later clarified that he thought "[a] large majority" of the 1,300 class members' subrogation payments were made directly to SFB by third-party carriers. *Id.* at p. 12. Ms. Sewell testified at the May 6 hearing that she agreed it was a "very large percentage" of cases in which subrogation was obtained by SFB directly from third-party insurers. (Doc. 74, p. 75).

[6] Even when an insured paid subrogation with a personal check, there is still the possibility that the estoppel defense may not apply, and further evidence will be required to establish estoppel. For example, during the May 6 hearing, Plaintiff called as a witness Jeffrey George Reidesel, a former insured of SFB and potential member of the 1,300-person class. Mr. Reidesel stated that he visited SFB's offices and presented his claims adjustor with a personal check for $5,000 in response to SFB's demand for subrogation. However, Mr. Reidesel also testified that at the time he paid subrogation to SFB, he was "unwilling" to make the payment, did not agree that he had been made whole through settlement, and made the payment "[g]rudgingly." (Doc. 74, pp. 103 & 108). Mr. Reidesel testified that he mistakenly thought that SFB's PIP payment was "a loan" that he was legally obligated to re-pay when SFB demanded payment. All of these facts may be material to determining whether an estoppel defense is applicable despite the fact that Mr. Reidesel paid subrogation to SFB with a personal check.

class." *Smilow v. Southwestern Bell Mobile Sys.*, 323 F.3d 32, 39 (1st Cir. 2003); *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 296 (1st Cir. 2000) (potential exclusion of certain class members from the class due to statute of limitations defense did not warrant refusal to certify the class, as "the mere fact that such concerns may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones."); *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 315 (3d. Cir. 1998) ("[T]he presence of individual questions does not *per se* rule out a finding of predominance."); *Merk v. Jewel Food Stores Div., Jewel Companies, Inc.*, 702 F. Supp. 1391, 1395-96 (N.D. Ill. 1988) (existence of affirmative defenses of waiver and estoppel did not require denial of class certification, even if some or all class members' claims would be affected); 32B Am. Jur. 2d *Federal Courts* § 1758 (2d ed. 2013).

The Court finds that common class issues predominate in the case at bar, even though individual issues arising from SFB's assertion of its affirmative defense may present themselves. Given the small number of clearly identifiable class members against whom the affirmative defense may be raised, and weighing this fact against the many factors discussed above and in the findings contained in the R&R, on balance class certification is appropriate.

## IV.    Conclusion

The Court agrees with the Magistrate's analysis that a class action appears to be the superior method of proceeding in this case, "given the number of potential class members and the relatively small amount of their claims and also given the fact that Plaintiff appears to be an adequate class representative and has diligently pursued this action."  (Doc. 60, p. 21).

The Court finds that the approximately 1,300 potential claimants who have been identified

by SFB constitute a class with similar claims that satisfies Rule 23(a)'s requirements of numerosity, commonality, typicality, and adequacy. As to SFB's objection that the class is unascertainable, the Court finds this objection to be without merit, as SFB has offered no competent proof that any oral or implied made-whole agreements actually exist, and SFB concedes that the 1,300 potential class members otherwise meet the proposed class definition. Further, SFB has presented no evidence or argument that persuades that Court that future discovery will yield proof of made-whole agreements. With that said, the Court does not discount the possibility that SFB may establish in the future the existence of oral or implied agreements as to one or more class members. Such evidence, if found, should be presented to the Court for evaluation on a case-by-case basis to determine whether any agreement was made and whether the class member affected should be excluded from the class. Such an inquiry would not require the Court to engage in a made-whole analysis as to any class member.

The Court also finds that the Magistrate did not exceed the proper scope of her charge in conducting a preliminary inquiry as to the relative merits of SFB's arguments in opposition to class certification. Such a limited merits-based inquiry is proper when done, as here, for the purpose of determining whether a class should be certified. Moreover, the Court agrees with the R&R's conclusion that Plaintiff has satisfied Rule 23(b)(3)'s predominance requirement, as the questions of law and fact that are common to the class predominate over individual questions. The possibility of SFB asserting the affirmative defense of estoppel is also limited, as described above, to certain factual situations involving a small number of potential class members and therefore does not defeat predominance. The Court finds that it is capable of addressing the applicability of the estoppel defense as to the limited number of class members to whom such defense would potentially apply

-24-

without taxing the Court's time and resources.

IT IS THEREFORE ORDERED that, for the above stated reasons, the Report and Recommendations (Doc. 60) is hereby ADOPTED IN ITS ENTIRETY.

IT IS FURTHER ORDERED that Plaintiff's Motion to Certify Class (Doc. 53) is GRANTED.  As noted in the Court's text only order of April 4, 2013, the Court will issue a revised scheduling order setting a trial date and related deadlines in this case.

IT IS SO ORDERED this 5th day of June, 2013.

/s/ P. K. Holmes, III

P.K. HOLMES, III
CHIEF U.S. DISTRICT JUDGE